DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **ALMA YECENIA MELENDEZ MELENDEZ,** | § § | |
| **Petitioner** | § § | Case No.: ___5:23-CV-1466___ ___ |
| **v.** | § § | |
| **CARMINE LUIZ GRECO JR.,** | § § | |
| **Respondent** | § | |

## <u>VERIFIED COMPLAINT FOR RETURN OF CHILD TO PETITIONER AND REQUEST FOR EXPEDITED HEARING</u>

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague On October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. § 9001, et seq.**

### I. PREAMBLE

1.        This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act [2] (hereinafter "ICARA").  Copies of the Convention and ICARA are attached hereto as **Exhibits A & B** respectively.  The Convention was adopted in the United States of America on July 1, 1988, and

---

[1]  T.I.A.S. No. 11, 670, at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986), a copy of which is attached as **Exhibit A**.

[2]  22 U.S.C. § 9001 et seq (1995).  ICARA is the implementing legislation for the Hague Convention enacted to address international abduction of children and to allow a petitioner to assert his or her rights in exigent circumstances. *See Distler v. Distler*, 26 F. Supp. 2d 723, 727 (D.N.J. 1998).

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

went into effect between the United States and Mexico, the habitual residence of the minor child, on October 1, 1991.

2.    The objectives of the Convention are as follows: (1) to secure the immediate return of a child wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and access under the law of one Contracting State are effectively respected in other Contracting States.  Convention, Art. 1.[3]

## II. JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331 because this case involves the removal and retention of a child under the age of sixteen from his habitual residence of Mexico to the United States of America.[4]

4.    Venue is proper in this Court because the child is presently residing with Respondent within the jurisdiction of the San Antonio Division of the United States District Court for the Western District of Texas, see 22 U.S.C. § 9003(b); 28 U.S.C. § 1391 (b)(1)-(2).

---

[3] As has been stated by other courts addressing Hague cases, the Convention therefore authorizes a federal district court to determine the merits of the abduction claim but does not allow it to consider the merits of any underlying custody dispute. *Morris v. Morris,* 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999) recognizing that "[p]ursuant to Article 19 of the Convention, [this Court has] no power to pass on the merits of custody"; see also *Currier v. Currier,* 845 F. Supp. 916 (D.N.H. 1994) citing *Friedrich v. Friedrich,* 983 F.2d 1396, 1399 (6ᵗʰ Cir. 1993); *Meredith v. Meredith,* 759 F. Supp. 1432, 1434 (D. Ariz. 1991). The court's role is not to make traditional custody decisions but to determine in what jurisdiction the child should be physically located so that the proper jurisdiction can make those custody decisions. *Loos v. Manuel,* 651 A.2d 1077 N.J. Super. Ct. Ch. Div. 1994).

[4] A court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute. The Hague Convention is intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court. *Lops v. Lops,* 140 F.3d 927, 936 (11ᵗʰ Cir. 1998) (citations omitted).

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

### III. PARTIES

5.     Petitioner, ALMA YECENIA MELENDEZ MELENDEZ (hereinafter "MELENDEZ") is the mother of C.G.M.,[5] the child who is the subject of this verified petition.

6.     Respondent CARMINE LUIZ GRECO JR. (hereinafter "GRECO") is the biological father of the child.  GRECO is currently in possession of C.G.M. in San Antonio, Texas.

### IV. FACTUAL BACKGROUND

7.     C.G.M. is the child subject of this lawsuit.  He was born in 2014 in Durango, Mexico. See copy of the birth certificate for C.G.M., along with a certified Spanish translation, attached hereto as **Exhibit C.**

8.     C.G.M. is a dual citizen of the United States of America and the United States of Mexico.

9.     Petitioner MELENDEZ lives in Durango, Mexico and she is a citizen of Mexico. Respondent GREGO lives in San Antonio, Texas and is a U.S. Citizen.

10.     MELENDEZ and GRECO began a long-distance relationship in November 2011 after meeting online. The parties met in person on or about April of 2012 in Saltillo, Coahuila, Mexico, after which GRECO would travel to Mexico about once a month to visit MELENDEZ.

11.     GRECO became abusive to MELENDEZ early in the relationship. During their first vacation together in Cabo San Lucas, Mexico on or about August 2012, GRECO turned irate after observing MELENDEZ speaking cordially with another man. A verbal altercation ensued, with GRECO jerking MELENDEZ forcefully by the arm several times, causing bruises. GRECO also

---

[5]  The child's full name and date of birth is intentionally omitted pursuant to the Western District's Privacy and Policy issued by the Court on October 29, 2004.

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

threatened to kill her during his jealous rage. Thereafter, GRECO decided to leave Cabo alone and return to Texas.

12.      MELENDEZ attempted to end the relationship after the trip as the incident had left her shaken. However, GRECO apologized for his behavior profusely after some time apart. In fact, shortly after this trip, GRECO asked MELENDEZ to marry him with promises of adjusting her legal status. Although MELENDEZ rejected his marriage proposal, the parties decided to give their long-distance relationship another chance.

13.      Between August 2012 and July 2013, the parties visited each other in both Mexico and the United States, with visits averaging about once a month. The parties broke up again during this time but would eventually rekindle their relationship.

14.      On or about July 2, 2013, MELENDEZ agreed to move to San Antonio with GRECO. He had been insisting on getting married, but MELENDEZ expressed reluctance due to his volatile temper. Instead, she agreed to move to San Antonio with GRECO on a trial basis to see if their relationship improved while residing together.  MELENDEZ left her home in Saltillo and even found a job at a restaurant in San Antonio. However, immediately after her arrival, GRECO became more controlling over her communications and insisted on having access to MELENDEZ' phone to monitor her conversations, which she continually refused.

15.      In August 2013, MELENDEZ' phone went missing for a few days.  An infuriated GRECO confronted MELENDEZ with messages that she had received from a man during their brief separation period.  Fearing for her safety, MELENDEZ decided to lock herself in one of the rooms. GRECO entered the room shortly after with a handgun in his hand. He paced across the room in a fury while yelling at MELENDEZ that he was going to kill her.  MELENDEZ tried to call GRECO's mother for help, but she didn't answer. Enraged, GRECO held the gun to MELENDEZ' head for what

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

felt for MELENDEZ like an eternity, while she cried and begged for her life. GRECO eventually stopped pointing the gun at her and yelled at MELENDEZ to leave the room or else he was going to kill her. MELENDEZ, who was scheduled to be at work that day, used the excuse that she had to get ready to calmly diffuse the situation with GRECO so that he would allow her to leave the home. GRECO would later admit to this gun incident in text messages to MELENDEZ. See **Exhibit D.** Immediately after this incident, out of fear and while she decided what her next steps would be, MELENDEZ started sleeping on the couch.

16.     About two weeks after the handgun incident, GRECO kicked MELENDEZ out of the apartment. GRECO was angry about not receiving enough attention from MELENDEZ. While MELENDEZ was in the bathroom about to take a shower, GRECO pulled her out of the bathroom by the hair and told her to leave. MELENDEZ left the residence without any money or any of her belongings, and all she had with her was her phone. MELENDEZ later called a friend named Juanita Walker (hereinafter, "WALKER") who provided her with shelter.

17.     MELENDEZ resided with WALKER and her sister for about 20 days. During that time, MELENDEZ was not answering any of GRECO's calls and she fell ill. At WALKER's insistence, MELENDEZ took a pregnancy test, and the results were positive. When MELENDEZ broke the news about the pregnancy, GRECO doubted the child was his until MELENDEZ showed him the blood test results.

18.     GRECO's reaction to the pregnancy only confirmed her decision to permanently end the relationship. However, in an attempt to coerce her back to his apartment, GRECO repeatedly refused to allow WALKER to pick up MELENDEZ' belongings. After a few days of going back and forth, MELENDEZ returned to the apartment.

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

19.     On or about October 26, 2013, MELENDEZ finally convinced GRECO to allow her to return to her home in Durango, Mexico. To get his permission to leave, she promised she would go back to him a few days later.  Despite her representations to GRECO, MELENDEZ did not intend to return to San Antonio due to the prior life-threatening incident with the handgun.

20.     A month after her traveling to Durango, MELENDEZ informed GRECO that she was not planning to return to the United States.  GRECO told her that he knew that the relationship had ended.  During MELENDEZ' pregnancy, GRECO would occasionally ask for updates, but failed to provide any kind of economic support.

21.     C.G.M. was born on May 13, 2014, in Durango, Durango, Mexico. GRECO was not present for the birth.

22.     GRECO's father, Carmine Luiz Greco (hereinafter, "GRECO SR".) met the child before GRECO, when he traveled to MELENDEZ' home in Durango from his residence in the border city of Acuna, Coahuila, Mexico in February 2015.

23.     In April 2015, almost a year after G.C.M.'s birth, GRECO traveled to Coahuila to meet the child for the first time. To facilitate GRECO's visits with the infant child, MELENDEZ traveled 13 hours to GRECO SR.'s home in the border town of Acuna, Coahuila, at her own expense. MELENDEZ would stay at GRECO SR's residence a couple weeks at a time to allow GRECO and GRECO SR. to visit with the child.

24.     During a subsequent visit in Acuna, and with MELENDEZ' mother present, GRECO and MELENDEZ had a conversation where GRECO told MELENDEZ that the "child would be hers" until the child turned 8 years old, at which point he would take the child to the United States. MELENDEZ told GRECO she was not in agreement with this.  At the insistence of GRECO SR. and GRECO, a Consular Report of Birth Abroad of the child would later be obtained.

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

25.     On or about November 2015, MELENDEZ and GRECO SR. travelled to Acuna with C.G.M. after an appointment at the U.S. consulate in Piedras Negras to facilitate a visit with GRECO. After MELENDEZ had already been there for about a month, GRECO informed her he was no longer coming to Acuna to visit the child, and as such MELENDEZ decided to leave for Durango shortly thereafter.

26.     During her time in Acuna, GRECO SR. became irate with MELENDEZ when she communicated to him that she was intending to leave and not wait for GRECO any longer. GRECO SR., who had become increasingly difficult during the past few weeks, began insulting MELENDEZ, grabbing her arm while she was walking down the stairs holding the baby, and pushed her out of the residence with C.G.M.

27.     After she was kicked out of GRECO SR.'s residence, MELENDEZ reached out to GRECO. Although she was able to find shelter for the first night at GRECO's cousin's house, GRECO refused to travel to Acuna to assist her or send her money. MELENDEZ and C.G.M. sought refuge and slept at an Acuna bus station on the second night until she could secure travel back to Durango the following day.

28.     GRECO later traveled to Durango for the child's birthday in May 2016. Due to the violent incident with GRECO SR., MELENDEZ informed GRECO that she would no longer travel to Acuna to facilitate visitation, nor would she allow GRECO SR. to visit her home in Durango.  Instead, the parties agreed that exchanges would occur in the border city of Piedras Negras, Mexico, which is about a 10-hour trip from MELENDEZ' home in Durango and about a 3-hour trip from GRECO's home in San Antonio. The parties also agreed that GRECO SR. would not be present during the exchanges.

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

29.     In May 2017, GRECO attended a birthday party for C.G.M. that was held in Saltillo, Coahuila. MELENDEZ' family was also present at the party. During the visit, MELENDEZ attempted to have a conversation with GRECO about child support. She informed him that she would begin the child support process soon through the regional office of the Ministry of Foreign Affairs. By this point, GRECO had not provided any sort of financial assistance despite MELENDEZ incurring substantial expenses to travel for the exchanges.

30.     Before leaving Saltillo, GRECO and MELENDEZ also revisited the issue of exchanges of the child. MELENDEZ proposed that she would travel to drop off the child at a public location in Acuna or Piedras Negras on the condition that either GRECO or GRECO SR. would return the child to MELENDEZ' home in Durango. GRECO told MELENDEZ that he would consult with GRECO SR.

31.     In December 2017, MELENDEZ arrived in Piedras Negras with the child to meet with GRECO; however, GRECO SR. was also present for the exchange, contrary to their agreement. GRECO traveled to San Antonio with C.G.M. for the first time and returned the child to MELENDEZ in Piedras Negras about 21 days later.

32.     GRECO didn't see the child again until over a year later. In May 2019, the parties exchanged C.G.M. in an Acuna bus station so that C.G.M. could spend his birthday in San Antonio with GRECO. On C.G.M.'s birthday, MELENDEZ received a call from C.G.M. who was crying because GRECO'S girlfriend Brenda Valdez (hereafter "VALDEZ") had told him that GRECO did not love him anymore. VALDEZ and her children had moved into GRECO's home. Distraught, C.G.M. also relayed that GRECO slapped his hand after he accidentally scratched VALDEZ' table. Concerned, MELENDEZ informed GRECO that due to these incidents, C.G.M. would not be

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

returning to San Antonio for further visits so long as VALDEZ continued to reside with him. The child was returned at the conclusion of the visit to MELENDEZ in Durango by GRECO SR.

33.    On September 30, 2019, the Ministry of Foreign Affairs and the Office of the Attorney General's Child Support Division, assisted MELENDEZ in filing a Uniform Interstate Family Support Act Petition in Bexar County, Texas, requesting support for C.G.M.  See **Exhibit E.**

34.    On November 6, 2019, an Agreed Order for Child Support under the Uniform Interstate Family Support Act was signed. See **Exhibit F.**  GRECO was ordered to pay $199.00 per month to MELENDEZ beginning on December 1, 2019, and monthly thereafter.

35.    On or about July 11, 2021, GRECO was arrested and charged with assault/bodily injury in Bexar County for striking VALDEZ.  MELENDEZ found out that this was not the first incident of violence between VALDEZ and GRECO, and that his other children had been witnesses to violence between the two parties.  MELENDEZ reminded GRECO that C.G.M. would not be visiting GRECO in San Antonio if VALDEZ continued to reside in the same home because she feared that the child could be a collateral victim of their volatile relationship.

36.    After MELENDEZ was provided assurances from GRECO that he and VALDEZ had separated after the incident of violence, she agreed to allow C.G.M. to resume visitation with GRECO in San Antonio in December 2021. The child was picked up by GRECO in Acuna and returned to Durango by GRECO SR.

37.    On or about early December 2022, the parties had a phone conversation to coordinate C.G.M.'s visit to San Antonio over Christmas break. During that conversation, GRECO and MELENDEZ agreed that MELENDEZ would travel to Acuna with the child to facilitate the exchange and GRECO SR. would return the child to Durango after spending a few days with his grandfather in Acuna.

38.     On or about December 17, 2022, MELENDEZ arrived in Acuna at the home of GRECO SR. with C.G.M.

39.     On or about December 25, 2022, MELENDEZ was informed that VALDEZ and GRECO were still living together despite his arrest. Concerned that C.G.M. would again witness violence between GRECO and VALDEZ, MELENDEZ requested that GRECO return the child to the grandfather's house so that GRECO SR. would in turn return the child to Durango. GRECO dismissed her concerns and called her stupid.

40.     On or about December 26, 2022, MELENDEZ contacted the regional office of Ministry of Foreign Affairs in Durango for assistance in retrieving the child. MELENDEZ was advised to wait and see if the child was voluntarily returned after the holidays before beginning the process to formally seek the return of the child.

41.     MELENDEZ informed GRECO that she had been told by the Ministry of Foreign Affairs that he should return the child. MELENDEZ demanded that the child be returned to Durango in early January, or she would otherwise proceed with legal action against GRECO.

42.     It wasn't until January 2, 2023, that MELENDEZ received a text from GRECO informing her that he had left C.G.M. "in Mexican territory where she had left him" at the home of GRECO SR., contrary to their initial agreement for the exchange. GRECO also confirmed that neither he nor GRECO SR. intended to return the child to Durango. See **Exhibit G.** MELENDEZ reminded GRECO that this was not the agreement and again requested that GRECO return the child to her in Durango. A frustrated MELENDEZ told GRECO that the child would be "staying there" if he did not return him to Durango, but subsequently warned GRECO of her intent to make an official report with authorities.

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

43.    On or about January 9, 2023, MELENDEZ received a phone call from a Mexican child protective agency akin to Texas' Department of Family and Protectives Services called *Integral Development of the Family* (hereinafter "DIF") who contacted MELENDEZ because GRECO Sr. had taken the child to the agency and was seeking assistance for his son GRECO to obtain custody of the child. See **Exhibit H.** MELENDEZ spoke to the agent to explain that they were holding the child without her permission and was allowed to speak briefly with C.G.M. using the agent's cell phone. MELENDEZ then tried to follow up with the agent by texting the number she was called from, but she was advised to file a criminal complaint with the District Attorney's Office. See **Exhibit I.**

44.    During the phone call, MELENDEZ requested that the agent direct GRECO SR. to return the child to Durango. However, shortly after, GRECO informed MELENDEZ that neither he nor GRECO SR. would be travelling to return the child to her in Durango after all. MELENDEZ again pleaded with GRECO to return the child, but he responded that "she should have thought about that "before acting stupid" and told her she would have to figure things out.

45.    After discussions back and forth, MELENDEZ again reminded GRECO that returning the child to Acuna was not the agreement and threatened him with legal action, to which GRECO responded by saying that GRECO SR. wasn't feeling well and that MELENDEZ would have to travel to pick up the child, since he "even left the child in her country". See **Exhibit J.**

46.    MELENDEZ was unable to do the 13-hour drive to pick up the child because she was experiencing substantial economic hardship and a close relative of hers had recently passed away just a few days before. She pleaded multiple times with GRECO and even made offers to send her brother to pick up the child or meet the child's grandfather somewhere in the middle. Meanwhile, she asked

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

GRECO to place the child in engaging activities until such time that GRECO would be forced to return the child to Durango per the agreement.

47.     On January 13, 2023, MELENDEZ filed a criminal complaint for child abduction with the District Attorney's Office of Durango. See **Exhibit K.**

48.     On January 16, 2023, MELENDEZ travelled to the DIF office in Durango to file a report with the Attorney's Office for Crimes Against Children and Adolescents and obtain information on how she could obtain custody orders. See **Exhibit L.** DIF informed MELENDEZ that they were going to issue an alert to prevent GRECO from crossing into the United States with C.G.M. She later learned that her request had been lost between agencies. DIF informed her that there was no point in issuing the alert because they could not confirm the child was still on Mexican soil.

49.     A distraught MELENDEZ went back and forth between agencies looking for help, as she feared that GRECO would take the child to San Antonio for good. She reached out to the National Institute of Migration and followed up with the Ministry of Foreign Affairs and the District Attorney's Office multiple times, to no avail.

50.     On or about January 17, 2023, GRECO's cousin, Maricruz Mendoza, confirmed that GRECO had taken the child to the United States and had enrolled him in school. Shortly thereafter, MELENDEZ realized that she had been blocked by GRECO through WhatsApp and Facebook messenger.

51.     Since the abduction, Respondent GRECO cut all the communication between Petitioner and the child. Once MELENDEZ realized GRECO was not going to return the child voluntarily, she submitted a Hague Application for Assistance through the Mexican Central Authority to the United States Department of State on January 26, 2023. See **Exhibit M.**

52     Ironically, weeks after she learned that the child had been taken to the United States, she learned that her request for a travel alert with the National Institute of Migration did not arrive at the agency until January 30th when the agency responded that she needed to re-do her request with the appropriate authorities. See **Exhibit N.**

53     MELENDEZ has not had any contact with C.G.M. since on or about January 9, 2023. C.G.M. had been living in Mexico with MELENDEZ his whole life. Prior to the removal, C.G.M. had not spent much time in the United States. In fact, prior to December 2022, C.G.M. had only visited his father in the United States approximately four times since he was born.

54.     C.G.M was an active little boy and participated in several extracurricular activities in his hometown of Durango. C.G.M. attended 3rd grade in Hermanos Flores Magon school. See **Exhibit O.** Due to the child's absences caused by the abduction, the school had to inform the District Attorney's Office about his truancy. See **Exhibit P.** C.G.M. was also receiving extra math tutoring at an institute called Kumon where he attended twice a week. See **Exhibit Q.** Additionally, C.G.M. was part of a competitive swimming team called "Anguilas Durango", where he trained five times a week. See **Exhibit R.** C.G.M. also practiced basketball on a team called "Sun Devils." See **Exhibit "S".**

55.     The only thing MELENDEZ has heard about her child or GRECO since January 2023 is that GRECO submitted a request to the Texas Office of the Attorney General for a status update since he now has possession of the child, which would have the effect of terminating his child support obligation. See **Exhibit T.**

56.     C.G.M. is now nine (9) years old. The Convention applies to cases where a child, under the age of sixteen (16) years, has been removed from his or her habitual residence in breach of rights

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal[6] of the child.

57.     At the time of Respondent GRECO's wrongful removal of C.G.M. (as specifically set forth in Part V. below), Petitioner MELENDEZ had custody rights to C.G.M. and was exercising them within the meaning of Articles Three and Five of the Convention[7] in that she is the mother and primary caretaker of C.G.M. As such, MELENDEZ was exercising her custody rights over the child since he was born.

58.     Furthermore, C.G.M. was a habitual resident of Mexico within the meaning of Article 3 of the Convention since C.G.M. has only lived in Durango, Mexico since birth and up to his wrongful removal to San Antonio, Texas in January 2023.

59.     Petitioner MELENDEZ has requested the return of C.G.M. to Durango, Mexico pursuant to her Application for Return of Child under the Hague Convention of the Civil Aspects of International Child Abduction ("Return Application"). This Application is admissible pursuant

---

[6] "Article 3 of the Hague Convention provides that the removal or retention of a child is wrongful where it violates the custody rights of another person that were actually being exercised at the time of the removal or retention or would have been exercised but for the removal to retention." *Lops* at 935, "[t]he removal of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if a person in that country is, or would otherwise be, exercising custody rights to the child under that country's law at the moment of removal." *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir. 1996); see *Prevot v. Prevot,* 59 F.3d 556 (6th Cir. 1995); Convention, art. 3.

[7] The issue of 'custody' must be addressed under Swiss law. *Pesin,* 77 F. Supp. 2d at 1284; see also *Whallon v. Lynn,* 230 F.3d 450 (1st Cir. 2000); *Freidrich v. Friedrich,* 983 F.2d at 1402; *Phlander v. Larson,* 114 F.3d 1531, 1541 (10th Cir. 1997) (stating that the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence of the child, without recourse to the specific procedures for the proof of that law…" See also Fed. R. Civ. P. 44.1. Petitioner MELENDEZ is a natural guardian of the minor children under the laws of Mexico, the child's habitual residence. A copy of Durango's Civil Code is attached hereto as Exhibit "U" and incorporated as reference.

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

to Article Twenty-Three of the Convention and International Child Abduction Remedies Act (ICARA), 22 U.S.C. §9005[8].

## V.  CAUSE OF ACTION:
## WRONGFUL REMOVAL OF THE CHILD BY RESPONDENT

60.      Under the Federal Rule of Civil Procedure 10(c), Petitioner MELENDEZ incorporates by reference all the allegations set forth above.

61.      A party seeking an order for the return of the child under the Hague Convention must prove by preponderance of evidence the following three elements: (i) Respondent removed or retained the child somewhere other than the child's habitual residence; (ii) the removal or retention violated Petitioner's "right of custody" under the laws of the habitual-residence country; and (iii) at the time of the removal or retention, Petitioner was actually exercising her "rights of custody" or would have so exercised, but for the retention or removal. 22 U.S.C. § 9003. All three elements are conclusively established here.

### (i) Respondent Removed the Child Somewhere other than the Child's Habitual Residence[9]

---

[8]  With respect to any application to the United States Central Authority, or any petition to a court under section 9003 of this title, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court.  22 U.S.C.A. § 9005 (West)

[9]  The United States Supreme Court has indicated that "a child's 'habitual residence' under the Convention and its implementing statute, ICARA, depends on the totality of the circumstances specific to the case, not on an actual agreement between the parents on where to raise their child and thus, requires a fact-sensitive inquiry, *Monasky v. Taglieri, 140* S. Ct. 719. 726 (2020)." The Supreme Court further elaborated stating that "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id.* at 727.

62.     At all times preceding the wrongful removal of C.G.M. to San Antonio, Texas, U.S.A. on or about January 14, 2023, C.G.M. was habitually residing in Mexico within the meaning of Article 3 of the Convention.

63.     C.G.M. had continuously lived in Mexico before the abduction and has only resided in San Antonio, Texas, as a result of GRECO's conduct. Respondent is also aware that MELENDEZ is unable to legally travel to the United States without immigration authorization.

64.     Petitioner MELENDEZ did not consent or acquiesce to Respondent GRECO's unilateral removal of C.G.M. from Mexico to the United States. Respondent GRECO abducted C.G.M. to San Antonio, Texas and has refused to return C.G.M. to Durango per the initial agreement after numerous requests.

### (ii) The Removal of C.G.M. Violated Petitioner's "right of custody" Under the Laws of the Habitual-Residence Country

65.     Petitioner MELENDEZ has rights of custody under the law of the country of Habitual Residence. Durango's Civil Code article 408 indicates that parental authority is exercised over the person and property of the children. The exercise of parental authority is subjected or shaped by the modalities established by court orders issued to that effect as they relate to the care and upbringing of the minor. Article 409 states that parents have parental authority over non-emancipated children. Accordingly, both parents share the parental authority of the children unless those rights are terminated, even after a separation. See **Exhibit U.**

66.     Since the rights and responsibilities of a person entitled to parental responsibility necessarily involve the care of the child, parental authority is therefore a right of custody under Mexican law and Article 5a of the Hague Convention. MELENDEZ, as the mother of the child, has

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

rights of custody by operation of law as no court orders entered by any court anywhere changed or terminated MELENDEZ' parental authority over the child. Furthermore, abducting a child to another country without the consent of the other parent is a crime according to article 165 of the Penal Code. See sworn statement of Attorney Christian Mario Garcia Castro, attached as **Exhibit V,**[10] regarding the relevant substantive legislation and articles of the Durango civil and criminal statutes and Durango's penal code attached as **Exhibit W**.

67.    GRECO's abduction of the child to the United States is therefore in breach of the MELENDEZ' Hague Convention article 5a "rights of custody".

### (iii) At the Time of the Wrongful Removal of C.G.M., Petitioner was Actually Exercising her "rights of custody" or Would Have So Exercised Them but for the Child's Wrongful Removal

68.    From the time child was born until Respondent GRECO abducted C.G.M. to the United States, Petitioner MELENDEZ was the parent of C.G.M. who had actual possession and control over C.G.M. in that the child lived primarily with her.

69.    As such, MELENDEZ was exercising her custodial rights and responsibilities over the child by living with the child, fully participating in his life, and undertaking all parental rights and responsibilities since the day he was born. In fact, the child support order under the Uniform Interstate Family Support Petition filed by the Office of the Attorney General designates MELENDEZ as the custodial parent and GRECO as the non-custodial parent. See **Exhibit F**.

---

[10] In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable. Convention article 14.

70.    Respondent GRECO's unilateral removal of C.G.M. was in violation of Petitioner's custody rights and thus, wrongful under Articles 3 and 5 of the Convention. Petitioner MELENDEZ had been in possession of C.G.M. prior to the wrongful removal. Respondent GRECO picked up the child from Petitioner's possession in Acuna on December 18, 2022, for visitation over Christmas break.

71.    Respondent's actions are contrary to Durango's Civil and Penal Codes. Under Article 416 of the Civil Code, children under parental authority are not to leave the house of those who exercise it without the permission of the parent with whom the children are living or by judicial order of a competent authority. The Penal Code also explains the crime of child abduction occurs when a parent or grandparent retains or abducts a child using deceit to abduct or retain a child outside of the country without the consent of the father or mother that has custody over the child. See **Exhibit W.**

72.    Furthermore, MELENDEZ never consented or acquiesced[11] to the permanent relocation of the child to San Antonio, Texas, as she demanded multiple times that GRECO return the child to his home. The fact that MELENDEZ was unable to pick up the child in Acuna should not be considered a consent to his removal to the United States.[12] Even while the child was still in Mexican soil, MELENDEZ sought the assistance of multiple Mexican agencies to facilitate the return of the child to Durango, as GRECO had renegaded on their agreement to return the child to his home dropping him off at his father's house 11 hours away. GRECO then secretly abducted the child and blocked MELENDEZ number and social media profiles.

---

[11] The mere fact that a petitioner allows a child to travel with other parent, and knows their location and how to contact them, does not constitute consent to removal or retention under the Convention. Baxter v. Baxter, 423 F.3D 363 (3rd Cir. 2005).

[12] "We emphasize, the defense of acquiescence calls for definiteness and clarity, i.e., a "clear and unequivocal expression of an agreement" or "a convincing written renunciation of rights." *Nicolson*, 605 F.3d at 108 (citation omitted) (internal quotation marks omitted); *see also Baxter*, 423 F.3d at 371. Darin v. Olivero-Huffman, 746 F.3d 1, 17 (1st Cir. 2014).

73.     Since the wrongful removal of the child, Petitioner MELENDEZ has done everything within her power according to Mexican and international laws to locate C.G.M. and secure the child's return to his habitual residence of Mexico, including an Application for Assistance for the Return of the Child Under the Hague Convention with the Mexican Central Authority.

74.     Accordingly, Petitioner MELENDEZ requests that the Court orders the immediate return of the child, C.G.M., to Mexico pursuant to the Convention and ICARA.

## VI.  DECLARATION PURSUANT TO THE UNIFORM CHILD CUSTODY JURISDICTION AND ENFORCEMENT ACT

75.     The required information under the UCCJEA is attached hereto and incorporated by reference as **Exhibit X.**

## VII. NOTICE OF HEARING

76.     Pursuant to 22 U.S.C. §9003(c), Respondent GRECO will be given notice of any hearing in accordance with Texas Family Code Section 152.205, Section 152.309.[13]

## VIII. ATTORNEY'S FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND 22 U.S.C. § 9007

77.     Petitioner MELENDEZ has incurred substantial expenses as a result of the wrongful removal of the child by Respondent GRECO. Petitioner MELENDEZ will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and considering further expenditure required because of this wrongful removal and retention.

---

[13]   The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. 22 U.S.C. § 9003(c).

78.    Petitioner MELENDEZ respectfully requests that this Court award all legal costs and fees incurred to date as required by 22 U.S.C.§ 9007, reserving jurisdiction over further expenses.

### IX. RELIEF REQUESTED

79.    Congress does not mince words when it comes to international child abduction: "The international abduction or wrongful retention of children is harmful to their well-being. Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention." [14] In the ICARA, which implemented the Convention in the United States, Congress sought to ensure quick and decisive action in cases of international abduction. The aim of these laws is the "prompt return of children who have been wrongfully removed or retained."19 Article 11 of the Convention states that a petition for return of an abducted child, such as this, shall be determined expeditiously, preferably "within six weeks from the date of commencement of proceedings." In light of the legislative and Convention language providing for swift resolution of this child abduction case, Petitioner requests that the Court acts with all reasonable dispatch to resolve this matter.

**WHEREFORE,** PETITIONER MELENDEZ prays for the following relief:

a.    the issuance of an immediate Order prohibiting the removal of the child from the jurisdiction of the court;

---

[14] In the United States, the Parental Kidnapping Prevention Act ("PKPA") and the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") govern notice in interstate child custody proceedings. *Klam v. Klam,* 797 F. Supp. 202, 205 (E.D.N.Y. 1992). The UCCJEA and Part (e) of the PKPA provide that reasonable notice and opportunity to be heard must be given to all parties before a custody determination is made. In Texas, the relevant statute is the State's UCCJEA, found in Texas Family Code §152.001, et.seq., which provides, in pertinent part, that "notice shall be given in a manner reasonably calculated to give actual notice and an opportunity to be heard" TFC §152.108, and that notice shall be given to all contestants, any parent whose rights have not been previously terminated and any person who has physical custody of the child. TFC §152.205. Furthermore, in cases where flight of a respondent is at issue, federal courts have allowed substituted service in any manner reasonably effective to give the respondent notice of the suit. *Ingram v. Ingram,* 463 So.2d 932, 936 (La.App. 1985).

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

b.      an Order setting an expedited hearing on the merits of Petitioner's MELENDEZ Verified Petition for Return of the Child;

c.      an Order granting Petitioner MELENDEZ increased and immediate unrestricted electronic access to the child, including immediate, regular and unfettered telephonic and/or video access to C.G.M. pending the resolution of this matter;

d       an Order granting Petitioner MELENDEZ's Petition for Return and directing the immediate return of the child to his habitual residence of Mexico;

e.      an Order directing Respondent GRECO to execute all necessary documents and procedures to facilitate the return of the child; and the travel arrangements for child's travel back to Mexico;

f.      an ORDER directing Respondent GRECO to pay Petitioner MELENDEZ's attorneys' fees, legal costs, travel and other costs and fees resulting from the wrongful removal of the child; and

g.      any such further relief as justice and its cause may require.


Respectfully submitted,

**TEXAS RIOGRANDE LEGAL AID, INC.**
1331 Texas Ave.
El Paso, Texas 79901
Tel: (915) 585-5145


By: */s/ Stephanie James*_____
STEPHANIE JAMES

TX SBN 24090990
sjames@trla.org

By: */s/ Maria Vallejo*_____
MARIA JOSE VALLEJO MANZUR

TX SBN 24110469
mvallejo@trla.org

Attorneys for Petitioner

DocuSign Envelope ID: C8D0A0EE-93C2-4520-9279-6DA389A6003D

## TRANSLATOR'S CERTIFICATE

I, PAOLA CAZARES, being fluent in the English and Spanish languages, hereby certify that I have read the foregoing Petition for Return of the Child to Petitioner ALMA YECENIA MELENDEZ MELENDEZ in Spanish and she has indicated to me that she fully understands it and the information herein is true and correct.

DocuSigned by:

*Paola Cazares*

Paola Cazares

Signature of Translator

## VERIFICATION

I, ALMA YECENIA MELENDEZ MELENDEZ, solemnly declare and affirm under the penalties of perjury and the laws of the United States of America, that the contents of the foregoing Petition are true to the best of my knowledge, information and belief.

Yo, ALMA YECENIA MELENDEZ MELENDEZ, solemnemente declaro y afirmo bajo las penalidades de perjurio y las leyes de Estados Unidos de América, que el contenido de la Petición de arriba son verdaderos de acuerdo a mis conocimiento, información y creencia.

11/14/2023 | 3:25 PM CST

Date

DocuSigned by:

ALMA YECENIA MELENDEZ MELENDEZ